Filed 12/14/21  In re C.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>C.G.,<br><br>    Defendant and Appellant. | F082527<br><br>(Super. Ct. No. 17JQ0046A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Moran Law Firm, Amanda K. Moran and Janay D. Kinder for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Minor C.G. appeals from an order of the juvenile court in proceedings under Welfare and Institutions Code section 602 adjudging him to be a ward of the court. After the contested jurisdictional hearing, the juvenile court found C.G. had committed a willful, deliberate and premediated murder (Pen. Code, § 187, subd. (a))[1] of W., another minor, and found true an allegation that C.G. committed the murder while engaged in a robbery (§ 190.2, subd. (a)(17)(A)). The court found not true a special allegation the murder was committed for financial gain (§ 190.2, subd. (a)(1)). At a dispositional hearing, the juvenile court ordered C.G. be adjudged a ward of the juvenile court and that he be committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF), for life up to age 25.

C.G. challenges the juvenile court's findings and dispositional order and argues there was no substantial evidence that (1) he committed the murder; (2) the murder was willful, deliberate and premeditated; or (3) that he committed the murder during the course of a robbery. C.G. also claims the prosecution failed to timely disclose evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). Finally, C.G. argues his counsel rendered prejudicially ineffective assistance by failing to investigate and by failing to call an expert witness. As explained below, we reject C.G.'s claims and affirm the juvenile court's findings and dispositional order.

**FACTUAL SUMMARY**

**I.     Procedural Background**

On July 10, 2018, a juvenile wardship petition was filed alleging that on May 10, 2017, C.G. committed first degree premediated murder. The petition also alleged the murder was committed for financial gain (§ 190.2, subd. (a)(1)), and was committed

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2.

during the course of a robbery (*id.*, subd. (a)(17)(A)).  The prosecution sought to have the case transferred to adult court, but the motion to transfer was denied.[2]

A contested jurisdictional hearing took place in February 2021.  On February 23, 2021, after hearing closing arguments, the juvenile court found C.G. had committed premediated murder, and found true the allegation the murder was committed during the course of a robbery.  The court found not true the allegation the murder was committed for financial gain.

A dispositional hearing was held on March 9, 2021, and the juvenile court committed C.G. to the DJF for a life term without parole with a maximum period of confinement up to age 25.

## II.     Juvenile Court Jurisdictional Hearing

A contested jurisdictional hearing took place between February 8 and February 11, 2021.  The prosecution presented numerous witnesses, and C.G. testified on his own behalf.

### A.     W.'s Murder

The victim's mother, S., testified she, her three children (W., O. and R.), her niece, and her father Jackie were living in an upstairs, four-bedroom apartment at the time of her son W.'s murder.  S. awoke that morning around 6:30 to 7:00 a.m., and W. was home at that time; she saw him get ready for the day along with the other children even though he was suspended from school.  She took the three younger children to school between 7:00 and 7:30 a.m., and arrived back home between 8:30 and 9:00 a.m.  When she got back, W. was still at home, and no one was with him.  W.'s friend C.G. showed up about

---

[2]     Kings County Probation Department filed a notice of probation violations alleging C.G. had been involved in two gang-related assaults while confined at the Kings County Juvenile Detention Facility.  The probation violation matters trailed the wardship petition and one was eventually voluntarily dismissed.

an hour or two later, although she was uncertain exactly when he arrived. She saw W. and C.G. outside near her parked cars, and W. was cleaning out one of the cars.

W. and C.G. had met at a skate park when S. and her children moved to the area in 2014. She thought they were good friends. However, S. knew she was going to have a problem with C.G. when he brought a kid to her house who wanted to fight W. over a girl. At a different time, C.G. had been involved in a fight where W. jumped in to help him. S. knew that W. was involved in selling marijuana; W. was getting in trouble at school because he was smoking marijuana, and he said he was selling the product for someone else.

At the time of his death, W. was being electronically monitored by the county probation department, and there was an electronic box near the door to the apartment that would light up when W.'s ankle monitor was in the proper range. When W. would go out of the allowed range, the lights on the box would turn off. He could not go to the local Heritage Park without the monitor indicating he was out of range, but he could go to the basketball courts at the apartment complex. W. would sometimes go to the park to hang out with his friends.

S. watched television and did laundry until it was time to pick up the kids from school. S.'s father, Jackie, also lived in the house, and he was in his room while S. was home. S. left to pick up the children between 12:30 and 12:45 p.m. As she came down the stairs from the apartment to her car, S. saw W. and C.G. outside. W. had on his peach-colored backpack. S. told W. to go up to the apartment and lock the door until she came back. She wanted him to lock the door because W. and C.G. were involved in "gang stuff," and they had been involved in fights. The apartment had a deadbolt lock, and S. was in the habit of keeping it locked. As S. drove away, she saw W. go upstairs while C.G. was standing at the bottom of the stairs. She did not see W. go inside the apartment because she was already driving away.

4.

After S. picked up the children from school, she ran some errands and returned to the home about 3:00 p.m. The door to the apartment was locked, and when they went inside, it was quiet. The dogs were in their kennel, and when she looked at W.'s monitor by the door, it indicated W. was home. S. did not look for W. because she figured he was in his bedroom where he normally was, so she went back to her bedroom. S.'s younger son O. shared a room with W., and when O. went back into his room, he found W. They had only been home a few minutes when S. heard O. screaming, and so she walked to his bedroom. The bedroom was not messed up, but W. was lying on his bed with his eyes open, not saying anything. She moved W.'s shirt and saw three or four stab wounds around his belly. S. immediately called 911 and gave the phone to O. so he could talk to the emergency dispatcher while S. started cardiopulmonary resuscitation (CPR). She and O. performed CPR on W. for what seemed "like [an] eternity," and then an officer arrived.

Detective Oswaldo Maldonado was dispatched to the apartment on a priority call. He went to a second-floor apartment, and found a young Black male on the sidewalk near the parking lot who appeared to be crying and distraught. Maldonado did not get a chance to speak with him as he ran to the apartment, went inside, and located the victim in a bedroom at the end of a long hallway. Inside the room, he found S. performing CPR on the victim.

The victim, W., was lying on his back; Maldonado took over CPR and another officer who arrived just after Maldonado, assisted. There was a lot of blood coming from the victim's abdomen, and Maldonado saw three distinct puncture wounds, about an inch or two wide. Maldonado performed CPR until emergency medical services (EMS) personnel arrived and took over. Maldonado found S. to get a statement. S. was on her phone when Maldonado approached her, and he overheard her saying W. had been stabbed and that she had dragged him off the bed to perform CPR.

5.

Jackie testified he was living at S.'s apartment, and he was there the day W. was stabbed.  He thought C.G. and W. were friends, but he did not know how long they had known each other.  C.G. would come to the apartment quite a bit, but the dogs they had were not familiar with C.G. and so they would bark when he was in the apartment.  Jackie knew W. sold marijuana and that he smoked it—but Jackie did not know how long that had been going on.

On the morning of the murder, Jackie showered after he woke up sometime that morning, but he could not recall the time.  He may have had a couple of beers the night before.  He thought W. was at home, but Jackie did not check for sure.  When Jackie got out of the shower, the dogs were making noise.  When he got dressed, he did not hear anything.  Jackie came out of his room after getting dressed because he heard the dogs again.  Jackie then saw C.G. standing by the front door, which was open about a foot.  Jackie remembered C.G. had on a white shirt and white tennis shoes, but he was not paying close attention to C.G.'s clothing.  Jackie asked C.G. why he was there and indicated C.G. was not supposed to be in the apartment.  C.G. told him that W. and Brian—another of W.'s acquaintances—were at Heritage Park, and Norteño gang members were trying to jump W.  C.G. wanted Jackie to hurry to the park because W. needed help.  Jackie went back to his room and grabbed his sunglasses and his hat, and he and C.G. left the apartment.  Jackie locked the door, and he was certain he did because he asked C.G. to make sure it was locked.  C.G. ran back up the stairs and jiggled the door handle, and then they took off toward the park.  C.G. then told Jackie that he needed to run home and change his clothes and that C.G. would catch up.  Jackie wondered why he needed to change, but he kept going because he was afraid W. was in trouble.

It took Jackie about 5 or 10 minutes to walk to the park, but no one was there when he arrived.  He estimated he was at the park anywhere from 45 minutes to two hours, but C.G. never showed up and Jackie never saw W. or any commotion.  Jackie walked to a nearby store to buy a beer and cigarettes, and then walked back to the park.

6.

He saw an ambulance and a firetruck go by when he was back at the park. A friend of Jackie's showed up in a car, and told Jackie to come with her because something had happened to W.

Jesse, a neighbor in the complex who lived across from W., testified C.G. was always with W., and they appeared to be friends. C.G. lived in the same complex as Jesse and W. Jesse was aware of W.'s trouble with other individuals in the area—Jesse described W. as a "rowdy kid" who was always outside "being loud." Other kids would come by and "talk crap to him, and he would talk back pretty much," but Jesse never saw a physical altercation.

Jesse would take his children to school in the morning routinely, and he would often see W. and C.G. playing basketball at the apartment complex's basketball courts. On the morning of W.'s death, he heard the basketball bouncing, and when Jesse looked up, he saw them playing at about 7:30 a.m., and at 8:00 a.m. when Jesse returned, they were still in the area. Although he heard the basketball bouncing after he went into his apartment, he did not hear any other noises like fighting or arguing. Jesse saw W. and C.G. walking toward W.'s apartment around 12:30 p.m. Nothing Jesse saw gave him a bad feeling. Jesse remembered C.G. was wearing dark clothing.

Brian, a friend of W., testified that he knew W. through Jackie, and Brian would drive W. to pick up marijuana in Hanford so that W. could sell it. Brian knew that W. had Xanax, but he was uncertain if W. was also selling the Xanax. W. had mentioned to Brian that he was having problems with the Norteño gang, and W. always seemed on guard. Once in a while, Brian and W. would smoke marijuana together, but they never used Xanax together. W. had an ankle monitor, although Brian did not know why. According to Brian, W. would have to get permission from his probation officer if they wanted to go to the park, and he had witnessed W. calling his probation officer on prior occasions. Brian was unsure, however, whether W. had to call the probation officer if he left the house.

W. carried marijuana around in a baggie, which he would then place in a bag with a draw string. About two days before W.'s death, they had driven around together and were dealing marijuana, which Brian had helped W. obtain—Brian estimated W. had about one or two ounces that day. Brian knew C.G. as one of the friends W. used to hang out with, and C.G. would buy drugs from W. Brian could not identify C.G. in court. On the morning of W.'s death, Brian called W., and W. said he needed to shower and would call Brian back. W. did not say he was with anyone.

## B.    Police Investigation

Detective Matthew Smith was called out to S.'s apartment after the murder, and arrived about 4:30 p.m. He was able to walk through the apartment at that time, and he saw numerous areas where there appeared to be blood. He saw what appeared to be a lot of blood in the bedroom; the bed was unmade and there was clothing on the bottom bunk. There was also an open pocketknife on the bottom bunk, which S. later confirmed was W.'s personal pocketknife. S. recalled the knife was next to W. in the bed when she found him. Smith did not recall any blood on the blade of that knife, and he could not remember any fingerprint hits off the knife, although it was submitted for testing. Smith eventually went to the hospital and talked to W.'s family, and then he worked on search warrants.

### 1.    Smith's First Interview with C.G. on May 10, 2017

Smith knew C.G. was a potential witness after talking with Jackie and S., and Smith arranged to speak with C.G. that evening (May 10) around 7:00 p.m. C.G. came to the station for the interview with his mother. Smith advised C.G. that W. was dead and that C.G. was the last one seen with W. He told C.G. he wanted a statement to figure out what happened; C.G. was upset, tearing up, and pounding the table with his fists.

C.G. said that after W.'s mother left, he and W. had gone to Heritage Park and met up with Brian and someone else named Fero. They smoked marijuana and took Xanax. C.G. said he and W. walked back to the apartment complex where they both lived, but at

8.

the entrance to the complex a white Expedition came up behind them. C.G. and W. ran toward the complex and the vehicle chased them. C.G. said he and W. split up, and individuals exited the Expedition and chased them both. C.G. went to his apartment and jumped the fence to his back patio. He stayed in the back patio area for about 20 minutes while he texted W. C.G. wanted to know if W. was okay.

C.G. then described that he went to W.'s apartment door and knocked to check and see if W. was okay because W. had never returned C.G.'s texts. C.G. was in the room with Jackie and said that he needed to get his charger. When Smith confronted C.G. at this point in the interview about the timeframe and when C.G. had seen Jackie, C.G. took a few seconds to try to remember; C.G.'s mother interrupted and advised Smith that C.G. was under the influence of Xanax, and he was not thinking clearly. Smith stopped the interview at that point. Smith never noticed any injuries on C.G.'s hands.

### 2. Smith's Continued Investigation

After concluding the interview with C.G., Smith started canvassing the area around the apartment and searching for video surveillance to follow up on C.G.'s story about the white Expedition and the chase. C.G.'s mother had also mentioned she had seen a white Expedition in the area in the past. Smith timed the walk between the apartment and Heritage Park as taking 14 minutes. It took Smith seven minutes to walk from the park to a Quick & EZ store that Jackie reported he walked to from the park. Smith then followed up with Jackie about Jackie's statement he had caught C.G. in the apartment that afternoon. Jackie gave Smith a receipt from the Quick & EZ for the purchases he made there that day.

Smith was able to serve a search warrant for the apartment that night around midnight. They collected bedding from W.'s room, and once that was removed, they found a peach-colored backpack directly under the bed. The backpack was unzipped and empty, and there was a green leafy substance on the inside of the backpack that appeared to Smith to be marijuana. No NIK (narcotics identification kit) test was performed on

9.

that, however, because it smelled like marijuana and it was limited to a small amount of residue. Smith did not feel a NIK test was necessary.

There were three cell phones directly off to the side of the bed, and the officers seized two of them. W.'s mother told them W. used only two phones, and the third phone had a cracked screen. They also took clothing from the bed, including a black sweatshirt, and they cut out a section of the carpet where W. was pulled to the ground for CPR. Smith remembered a large amount of blood on the floor of the bedroom and on the bed; there were handprints all over the wall and the area where they were working on W. Smith did not recall seeing any footprints. They took latent prints from everything and sent them out. There was no blood spatter on the wall; it seemed concentrated, not splattered. They found a SpongeBob backpack,[3] which they photographed.

Smith served a search warrant at C.G.'s apartment six days later. Smith did not remember taking anything from C.G.'s residence; he never found a knife. They went through C.G.'s clothing and the bedroom he shared with his brother, but there was nothing of interest to the investigation. Smith also interviewed Fero about a week after the murder and asked him when he had last seen W. Fero, who Smith knows to have mental health issues, said he had seen W. about three days before at Heritage Park in the late afternoon, but this would have been impossible because three days earlier W. had already been killed. Smith also never found a white Expedition.

An extraction of C.G.'s phones was also performed, and Smith obtained a warrant for C.G.'s Facebook information. There was a conversation between C.G. and A.C. that started around midnight on the morning before the stabbing and went until about 3:00 a.m. Another conversation occurred between the two around 9:00 a.m. on the morning of the murder, which was about a deal for belts—two belts for $700. Then there

---

[3] SpongeBob is a cartoon character. The reference to the SpongeBob backpack is to distinguish it from the peach backpack also found in W.'s room. S. testified W. carried clothing in the SpongeBob backpack.

was another conversation that started around 2:00 p.m. andcontinued until about 3:00 p.m. in which C.G. offered a zip for the belts. A zip usually refers to about an ounce of marijuana. They did not agree on that amount, and then there was discussion of an upgrade to a pound of marijuana in exchange for the belts, and there was an agreement to that amount. At 2:19 p.m., C.G.'s phone sent a picture to A.C.'s phone of a sandwich-sized bag of marijuana. That photo has background elements that are very similar to the backyard patio area where C.G. resides. The last message from C.G. to W.'s phone occurred just before 4:00 p.m.

Smith also investigated W.'s Facebook and Snapchat accounts. The information from the Snapchat warrant showed W.'s account sent a message to a user on May 10, 2017, at 12:53 p.m.

### 3. Quick & EZ Confirmation Evidence

Officer Cody Rogers testified Smith asked him to check on surveillance video from the Quick & EZ on the day of the murder, which Rogers did. Rogers made contact with the store manager and asked to review the surveillance video. He confirmed Jackie was at the store at the time Jackie told Smith he had gone there. Smith had given Rogers a receipt Jackie had provided to Smith. When Rogers viewed the surveillance video, he saw Jackie on the video, whom he recognized from reviewing a police database. Rogers noticed the timestamp on the video was incorrect by about an hour and 15 minutes. The manager knew about the timestamp delay on the surveillance video.

The Quick & EZ store manager testified Jackie would come to the store often, although not every day. The manager provided surveillance video to officers when they requested it. He confirmed there was a time delay on the surveillance video clock of more than an hour.

### 4. Smith's Second and Third Interviews of C.G.

Smith conducted a second interview with C.G. on May 13, 2017, in the early afternoon at the police department headquarters. C.G. said he had ditched school on the

11.

day of the murder and got a ride from Randy about 11:30 a.m.; Randy and C.G. went to W.'s house, and they all smoked marijuana, and then Randy left. Then C.G. and W. went to Heritage Park. C.G. said Fero was there, and later in the interview C.G. also said Brian was there. C.G. said W. had two ounces of marijuana on him, as well as 10 to 12 Xanax pills. C.G. told Smith he was aware W. was selling drugs. Smith told C.G. and his mother that they had recovered W.'s backpack and cell phones, but there were no drugs in the backpacks. C.G.'s mother said it was the peach-colored backpack that W. carried his drugs in, and C.G. confirmed that was correct. When Smith tried to confirm when C.G. and W. went to the park that day, C.G. said he and Randy went to the apartment at 11:30 a.m., and as soon as S. left, they went to the park.

Smith also asked C.G. about his encounter with Jackie. C.G. initially said the door to W.'s apartment was locked, and Jackie came to the door and they talked there. C.G. also said he was knocking at the door and the wind blew it open; C.G. was entering the apartment and Jackie came out of his room. Then, C.G. said he went inside the apartment to retrieve a belt and saw Jackie. C.G. gave a fourth version that he had entered the apartment because the wind blew the door open and he took a couple of steps into the living room before Jackie stopped him.

C.G. said the front door to the apartment was locked right before he saw Jackie, but then said it was unlocked. Smith testified the call log on W.'s phone showed that between 1:00 p.m. and 1:08 p.m., C.G. left messages such as "[t]he Nortes are by your apartment" and "[t]hey chased me with knives," but there were no responses from W.'s phone.

Smith interviewed C.G. a third time on July 6, 2018, after C.G. had been arrested. C.G. denied that Fero or Brian were at Heritage Park when he and W. walked over. C.G. denied entering W.'s apartment at any time. C.G. said he knocked, Jackie answered the door, C.G. explained the situation, and they started walking to the park. C.G. said he excused himself to get a knife from his apartment.

12.

## C.    Forensic Evidence Collected at the Scene

A criminalist testified about how the crime scene was documented, and how various items found at the scene were tested. She went to the apartment on May 17, 2017, and documented the scene through photographs and searched for biological fluids—specifically, blood. Several spots throughout the bedroom contained blood, and it was collected and submitted to the lab for DNA analysis. They collected a five-millimeter square swab—about the size of a pencil eraser—from the carpet near the television. She did not know how long the stain had been there. She analyzed the blood from the carpet square against the DNA samples they had obtained from the victim and the suspect. That sample did not match the victim, but the suspect could not be excluded as a contributor of the DNA. The DNA was analyzed to determine how rare it was that it matched C.G.'s sample. The profile from the DNA sample found in the carpet swab would be expected to occur in 1 in 12 nonillion randomly unrelated African-Americans; 1 in 14 nonillion Caucasians; or 1 in 2.4 nonillion Hispanics.[4] The criminalist testified finding a match to that DNA sample would be like finding a needle in a haystack. No other DNA sample in the room matched the sample from the carpet swab.

## D.    Autopsy

A medical examiner testified he performed W.'s autopsy in 2017. He observed a total of five stab wounds: three stab wounds were clustered around the abdomen, a fourth stab wound was located in the neck, and a fifth was found in the left upper chest. The puncture wounds were classic almond shape, which is frequently seen in a stab wound. There was also a laceration at the root of the thumb on W.'s left hand, which was consistent with a defensive wound. The cause of death was bleeding due to the sharp-force trauma wounds to the abdomen. The examiner opined that although it was possible it took up to 60 minutes for W.'s heart to stop after he was stabbed, it more likely took

---

[4]    One nonillion is 1 followed by 30 zeros.

13.

only a few minutes. A toxicology examination was also performed, which was positive for Alprazolam and alpha metabolite, and it was positive for a nonpsychoactive metabolite of THC. Alprazolam is commonly referred to as Xanax, which is a sedative hypnotic drug that is prescribed frequently to treat anxiety. THC refers to marijuana.

Based on the levels in W.'s system, the Xanax would have caused him to be under the influence to some extent, but it was in the "low toxic range" and far from being in the fatal range. The THC had no psychoactive component to it; its presence simply meant that W. had smoked marijuana at some point in the past.

### E.    Other Testimony

#### 1.    W.'s Ankle Monitor

W.'s probation officer (PO) testified that she was supervising W. at the time of his death; he was waiting for an adjudication, and he was required to wear an ankle monitor. The range of his monitor was 150 feet. If W. went outside that 150-foot range, the monitor would send an alert. If W. wanted to go outside the range, he would have to call her office and ask for permission. Around the time of his death, the PO remembered he had called to say he wanted to go to the basketball court, which she gave him permission to do.

The PO explained the report from the monitor that tracked W.'s movements, but it was not a document she created—it was generated automatically through a tracking system. She did not have access to generate the reports, and she could not manipulate the data. On May 10, 2017, there was an unauthorized leave (outside of range) at 9:41 a.m., and an unauthorized entry (inside of range) at 12:00 p.m., and a final unauthorized leave at 3:51 p.m. He may have had permission to leave at those times, but she did not remember a call or message from either W. or his mother.

#### 2.    C.G.'s Belt Negotiations With A.C.

A.C. testified he was friends with C.G., and had a conversation with C.G. around May 10, 2017, about high-end luxury belts that A.C. had. They talked about it at school,

14.

and then they were texting about what A.C. wanted for the belts. C.G. offered marijuana in exchange for the belts. They were communicating through Snapchat, and C.G. sent a photo of marijuana. A.C. testified he was "shocked" because he did not really buy that much at the time, so he told C.G. that was more marijuana than he really needed. A.C. indicated all he really wanted was money for the belts. They had also messaged some on Facebook, but not too much. They continued to message for a few minutes, and then C.G. showed up at A.C.'s house sometime when it was dark outside and after the photograph had been sent. C.G. did not have any marijuana with him. C.G. was trying to get the belts, saying he would bring back money, but A.C. did not want to give him the belts so A.C. told him to leave.

### 3. C.G.'s Marijuana Sale After the Murder

B.L. is a cousin of W., who saw W. the day before the murder. B.L., W., C.G. and B.L.'s cousin Randy were all in a car together. W. and C.G. were in the backseat, while B.L. was in the front. W. handed a dark brown-colored backpack to B.L., and B.L. saw that it contained three or four ounces of marijuana and some green pills. The marijuana was in two baggies—one smaller and one larger. B.L. returned the backpack to W., and they just continued talking about school. B.L. knew that W. sold drugs; W. had told him that C.G. was a "homie," that W. had taken C.G. under his wing, and would give him some weed to sell and get his own money.

B.L saw C.G. at school about three or four days after the murder. C.G. was with someone named Sisco. C.G. had what looked like white tissue paper wrapped around the knuckles of his right hand. B.L. confronted C.G. about some pills and weed that B.L. thought had belonged to W. C.G. said he already had those items—the items were his. B.L. was certain those were W.'s drugs, however, because a good friend of B.L.'s (Breeza) bought marijuana from C.G. just after the murder, and when Breeza showed the marijuana to B.L., he recognized it as the distinctive type of marijuana W. sold. This was why B.L. confronted C.G.

15.

B.L. testified he is very familiar with the different strains of marijuana, and W. has provided him with marijuana in the past. The marijuana he had seen W. with the day before was brown and a specific type. When Breeza showed B.L. what she had purchased from C.G., it was the exact same brown color and smell as the marijuana B.L. saw in W.'s backpack the day before the murder. The marijuana that W. sold was distinctive and unusual.

B.L. also testified he knew W. had problems with gang members—W. was a self-proclaimed Blood gang member, and he got into physical altercations with Northerners a lot. When they had been together the day before the murder, though, W. had not mentioned any conflicts with gang members. W. never told B.L. that Northerners were trying to kill him, W. said only it was going to be a problem if they caught him.

## III. Defense Case

C.G. testified in his own defense. C.G. met W. when W. moved to the apartment complex in 2014 or 2015. They were close friends, and they did everything together, including selling drugs. They each had their own portion of marijuana they sold—they had separate connections for obtaining it, and sometimes they stole it. They had stolen marijuana together about three or four days before W.'s death. W. had told C.G. he did not like his old connection anymore, that the connection—someone named Alex—had done W. "dirty or something" and that W. wanted to rob him. C.G. agreed to participate, and they were able to steal about 1.5 pounds of marijuana and about 20 Xanax pills. They had gone to Alex's residence in Hanford and went inside through a window while he was gone. C.G. had never met Alex before. Alex knew they had stolen the marijuana, and he made threats against C.G. and W. C.G. never reported Alex's threats to the police.

On May 10, 2017, C.G.'s mom dropped him off at school, but he ditched around noon. He was wearing a black sweater with a "P" on the left side, tan cargo pants, and black shoes. He went to W.'s apartment and hung out on the stairs; then they walked to

16.

Heritage Park.  He and W. had used drugs before and while they were at Heritage Park.  They smoked when they were in the car with Randy, and they took pills.

At the park, W. was waiting for Brian, but Brian never showed up.  After about 25 minutes, they walked back to the apartment.  As they drew near the apartments, they saw a white Expedition.  C.G. already knew who it was, and he and W. knew they did not have any protection, so they took off running and the Expedition chased them.  They split up during the chase; C.G. went to his apartment, and W. went toward his.  C.G. hid on his back patio for 10 or 15 minutes and started texting W.

When C.G. did not get any responses from W., he ran to W.'s apartment and knocked two times.  The door opened a bit, Jackie opened it the rest of the way and asked what C.G. was doing.  C.G. told him he was looking for W. and Jackie said W. was at the park and that was where Jackie was going.  C.G. offered to go with him, and then Jackie came outside, locked the door, and they proceeded to the park.  C.G. told Jackie he had to get something and that he would catch up with Jackie.  He never told Jackie he was going to change his clothes, nor did he change clothes.  He went back to his apartment to get a knife.  However, after C.G. came out of his house, Jackie was gone.  C.G. did not want to go to the park by himself, so he went back into his apartment.  His mother's ex-boyfriend took him to his cousin's house in Hanford, and he ended up taking the knife with him because he thought he was in danger, and he left it there.  While he was in Hanford, he got a call about W. and that the police were at his apartment.  C.G. broke down crying, he started smoking and drinking, and did not remember what happened after that.

He did remember going to the police station that evening after his mom picked him up in Hanford.  His blood got in W.'s room because a couple of days before the stabbing, C.G. was fidgeting with a belt to make an extra hole in it, and he cut his hand doing that.

C.G. identified the two people in the Expedition who were chasing him and W. as J.Z. and M.B.  He had pointed them out to Smith during an interview.  He messaged A.C.

17.

later that night about the marijuana. C.G. lied to A.C. about having a full pound of marijuana, but he thought he could rob A.C. for the belts. C.G. admitted he had gone to A.C.'s house to try to get the belts, but A.C. would not give them to him. C.G. admitted the photograph of the baggie of marijuana was the one he had sent to A.C., and that he sent that picture to A.C. after the Expedition had chased him. C.G. testified he was under the influence at that time, so he did not really know what was going on. C.G. denied that W. kept all the money from his marijuana sales and denied that W. was the only one with the product. C.G. maintained W. had the same type of marijuana that C.G. had.

C.G. testified he never changed his clothes the day of the murder; he had on the same clothes he went to school in when he was interviewed that evening by Smith. C.G. denied that he killed W. On cross-examination, C.G. testified he did not remember during his interviews with Smith whether he said J.Z. and M.B. were *not* the men in the white Expedition who chased him.

## IV.    Juvenile Court's Findings and Dispositional Order

At the conclusion of the jurisdictional hearing, the juvenile court found true the allegation that C.G. committed premeditated first degree murder. The court also found true the allegation C.G. committed the murder during the course of a robbery. The court found *not true* the special allegation the murder was committed for financial gain.

The trial court offered the following discussion of the facts and findings:

> "In my opinion the pertinent time period regarding the murder of [W.] was between 12:00 p.m. to 3:30 p.m. on May 10th, 2017. This is important because somewhere between 12:00 and 12:30 p.m. [W.] was alive and he was murdered before—before 3:30 p.m. [¶] [W.] was seen by his mother going up the stairs to their apartment when she was leaving to go pick up her kids in Visalia from school. Prior to leaving she told [W.] to stay in the apartment, make sure the door was locked.
>
> "Also at this time the minor, [C.G.], was with the victim. And the mother left the area prior to seeing her son actually going into the apartment. [¶] [Jackie] testified that when he woke up that day he took a shower, he didn't see or hear anything. He then heard the dogs barking and

18.

went to check why they were barking, and that is when he saw [C.G.] in the apartment getting ready to leave. [¶] [C.G.] told Jackie that [W.] was at the park with Brian and there was some sort of altercation that was going to take place. Then Jackie and [C.G.] left to go to the park.

"On the way to the park [C.G.] told Jackie he needed to go change his clothes and he would meet up with him later. [¶] Jackie stayed at the park waiting for [W.] or [C.G.] … to come back. And he also went to the local Quick & EZ to purchase some liquor, the receipt time was 2:03 p.m. [¶] The logical reason for luring Jackie away from the apartment was that [C.G.] had just murdered [W.] and wanted to distance himself from that apartment and the murder of [W.]

"From the electronic monitoring system that [W.] was wearing we know that [W.] stayed in that apartment from 12 noon to 3:40 p.m., and he was taken from his home by the ambulance. So [C.G.] was with [W.] at 12:00, [W.] was alive at that time. [¶] Further, when [S.] saw her son around 12:00, he never went out of range from that monitor. In other words, [W.] did not go to Heritage Park with [C.G.] If he had, he would have been out of range and the EMS would have reflected this. [¶] [W.] was not chased by people in a white Expedition, as claimed by [C.G.] [¶] [W.] did not go and smoke weed with [C.G.] prior to going to the park nor at the park. Not only does the EMS confirm this, but the autopsy showed that [W.] only had the metabolite for cannabis in his system and was not under the influence.

"Further evidence of [C.G.]'s guilt in this case is the fact that his blood was located in the room of [W.] [¶] [A.C.] and [C.G.]'s testimony provides the motive for the killing of [W.]; [C.G.] wanted to purchase and/or trade and/or rob [A.C.] of some very expensive belts.

"On May 10th, the day [W.] was murdered, [C.G.] was in communication with [A.C.] as early as 3:00 that morning. [A.C] testified that [C.G.] offered him a pound of marijuana to trade for the belts. [C.G.] testified at trial that he never had the additional half pound of marijuana, in fact, [C.G.] testified that he didn't have the additional half pound and that his plan was to rob [A.C.] with a knife.

"The significance of the cell phone communications demonstrates a strong desire of [C.G.] to get that belt. In fact, [C.G.] testified on that date, after [W.] was killed, [C.G.] called [A.C.] later that night to again try and sell him a large amount of marijuana and obtain the belt. He also went to [A.C.]'s home that night after the murder to ask for the belt again. He tried

19.

to get [A.C.] to give him the belt and would pay him later. [A.C] had to tell [C.G.] to leave because he didn't think [C.G.] was going to.

"[C.G.] further testified that he had a knife and was going to use that knife to rob [A.C.] At the time that [C.G.] went to [A.C.]'s home he already knew that his best friend had been murdered and this did not stop him from pursuing this obsession he had with the belt. [¶] Further, we know that [C.G.] had [W.]'s marijuana because he sold some of it to a person named Breez[a]. [C.G.] admits that he sold the marijuana to Breez[a]. This marijuana had a particular characteristic, one that [B.L.] testified to that he even gave a name to because it was a type that [W.] was known for selling.

"[C.G.] testified to an implausible scenario as to how he ended up with the same type of marijuana that [W.] sold; he testified that he and [W.] robbed his dealer because [W.] was mad at him, and as a result the drug dealer was threatening both boys. However, when question[ed] further in detail it wasn't a robbery, it was a burglary at night where they went undetected through a window to obtain the marijuana. At least this is what [C.G.] testified to. And I find that story just a story, an untruth.

"The Court will make the following findings: The Court does find true, as to Count 1, a violation of … Section 187, in that [C.G.] did unlawfully and with malice aforethought murder [W.], a human being.

"The Court also finds that the murder was committed willfully and deliberate and with premeditation within the meaning of the … Section— [¶] … [¶] The Court finds not true the special allegation pursuant to … Section 190.2[, subdivision ](a), murder for financial gain. In order for this allegation to apply[,] the death must be a consideration for or a central prerequisite to the financial gain sought by the defendant and was typically arising from murder for hire, murder for inheritance or murder for insurance.

"The Court does find true the special allegation pursuant to … Section 190.2[, subdivision ](a)(17), murder in the commission of a robbery."

At the March 9, 2021, dispositional hearing, the juvenile court ordered C.G. be committed to DJF for a life term without parole, with a maximum period of confinement up to age 25.

20.

**DISCUSSION**

**I.      Substantial Evidence Supports the Juvenile Court's Findings**

C.G. argues there is no substantial evidence that he committed the murder; that the murder was willful, deliberate and premediated; or that the murder was committed during the course of a robbery.

**A.      Standard of Review**

"Our review of the minor['s] substantial evidence claim is governed by the same standard applicable to adult criminal cases." (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) The relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357).

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.)  "'[I]t is the [factfinder], not the appellate court which must be convinced of the defendant's guilt ....'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.)

"'"[O]ur role on appeal is a limited one." [Citation.]  Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence.  [Citation.]  Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of  the judgment.  [Citation.]'" (*In re V.V.*,

*supra*, 51 Cal.4th at p. 1026.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the [factfinder's] verdict." (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.)

### B.     Substantial Evidence Links C.G. to the Crimes

C.G.'s core contention is that there is no substantial evidence linking him to any crime against W.  C.G. claims all the evidence connecting him to the crime was merely circumstantial, and more than one set of reasonable inferences could be drawn from that evidence—i.e., the circumstantial evidence did not prove C.G.'s guilt beyond a reasonable doubt.

For example, C.G. argues there was no direct evidence connecting him to the stabbing, Jackie did not report seeing any blood on C.G., and no murder weapon was ever found.  From these facts, C.G. maintains, the juvenile court should have more reasonably concluded C.G.'s presence in the home around the time of the murder was merely coincidence, and Jackie's failure to notice any blood on C.G. or any marijuana in his hands pointed away from a conclusion C.G. was the perpetrator.  Moreover, C.G. points out, he was not near the bedroom when Jackie discovered him at the apartment, he was by the door.  According to C.G., the marijuana C.G. later sold to Breeza was actually part of a stash C.G. and W. shared after having stolen it from W.'s supplier, which undercut any contrary finding C.G. had stolen W.'s marijuana.  Finally, C.G. asserts, the motive proposed by the government makes no sense—C.G. and W. were best friends and they did everything together, so there is no reason to believe C.G. killed his best friend over some belts.

These arguments, however, misapprehend the substantial evidence review standard on appeal.  "'"Although it is the duty of the [factfinder] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [factfinder], not the appellate

22.

court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]"'" (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Thus, the fact that the juvenile court could have credited different testimony and drawn other inferences from it is not a basis for reversal on appeal.

The substantial evidence standard requires us to view the evidence in the light most favorable to the juvenile court's findings and draw all reasonable inferences in support of them. When viewing the evidence through that lens, as we must, we conclude substantial evidence supports the juvenile court's conclusion C.G. was the person who stabbed W., causing his death.

While the evidence pointing to C.G. as the perpetrator was largely, if not wholly, circumstantial, the evidence's character as circumstantial does not make it insubstantial nor does it render inferences drawn from it speculative. (*People v. Abilez, supra*, 41 Cal.4th at p. 504 ["'""Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt."''"]; see *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 ["circumstantial evidence is as sufficient as direct evidence to support a conviction"].)

Based on Jackie's and S.'s testimony, W.'s ankle monitor data, cell phone extraction data, and blood found in W.'s room that matched C.G., it could be reasonably inferred C.G. was not only in the apartment at the time of the murder, but he had been in W.'s room. S. saw W. alive and with C.G. downstairs from the apartment at about 12:30 to 12:45 p.m. when she went to pick up the kids from school. Upon hearing the dogs barking and discovering C.G. in the apartment after S. left, Jackie testified he locked up the apartment and left (which C.G. also corroborated in his testimony). Both S. and

Jackie testified there was no issue with the apartment lock, and S. testified the only other entrance to the apartment was locked at all times.

W.'s ankle monitor indicated he never left the 150-foot range of the apartment after noon. W.'s last phone data showed an outgoing message at 12:53 p.m., and he never responded to any of C.G. messages that were sent at and after 1:00 p.m. Thus, it was reasonable to infer the stabbing occurred between the time S. left the apartment around 12:30 p.m. and the time Jackie left the apartment. Beyond C.G.'s presence in the apartment at the time of the murder, a small amount of C.G.'s blood was discovered on the carpet in W.'s room.

When C.G. was confronted by Jackie, he told Jackie that W. was in trouble at the park. But, instead of going with Jackie to the park, C.G. decided to go home. When Jackie got to the park, no one was there and C.G. never showed up. Together with his appearance in the apartment, his blood in W.'s room, and W.'s ankle monitor data, C.G.'s story about W. being in trouble at the park could be reasonably considered a way for C.G. to get Jackie out of the apartment and distance himself from the apartment before W. was discovered, especially since C.G. never showed up at the park after parting company with Jackie.

It could also be reasonably inferred Jackie left the apartment about 1:00 p.m. Jackie testified he walked from the apartment to the park—a walk that Smith timed to take about 15 minutes. Jackie estimated he was at the park for about 45 minutes; he then walked to the Quick & EZ (a seven-minute walk when Smith timed it) and made a purchase for which a receipt was timestamped at 2:03 p.m. The store's video surveillance captured Jackie's presence in the store at that time. For all of that to occur by 2:03 p.m., Jackie had to have left the residence around 1:00 p.m. or shortly thereafter. From this evidence it was also reasonable to infer no one accessed the locked apartment until S. returned to the apartment, which was still locked, about 3:00 p.m. and found W.

24.

Beginning at 1:00 p.m. to about 1:08 p.m., C.G. sent multiple messages to W.'s phone saying C.G. had been chased by gang members with knives and that the Norteños were by W.'s apartment, to which W. never responded. C.G. told Smith he started sending W. text messages right after they had been chased. Yet, C.G.'s story was implausible given the timing of the text messages to W. According to C.G., he and W. had walked to the park, smoked marijuana, walked back to the apartments, and were chased by the men in the white Expedition all between the time S. left the house about 12:30 p.m. and when C.G. sent the text messages at 1:00 p.m. By itself, walking to and from the park would have taken about a half hour. Beyond that, W.'s ankle monitor data showed W. was within the 150-foot range of the apartment at all times after 12:00 noon, indicating he never went to the park after his mother left the apartment.

Moreover, C.G.'s statement to Smith that he and W. were chased by men in a white Expedition could not be corroborated by Smith's investigation, and a neighbor who was home said he never heard or saw anything unusual between the time he heard the boys playing basketball and when emergency and police personnel responded to the scene. Not only were these conflicts highly damaging to C.G.'s credibility, a reasonable inference could be drawn from the totality of the evidence that C.G. sent the text messages from 1:00 to 1:08 p.m. to W. to manufacture other suspects and create some type of alibi for himself after he had been seen by Jackie. (See *People v. Becker* (1951) 106 Cal.App.2d 208, 219–220 [the defendant's systematic preparation of sham evidence, along with other evidence, supported reasonable inference the defendant committed the murder].)

Coupled with C.G.'s presence at the apartment during the time window when the murder took place, there was also strong evidence of C.G.'s motive to commit the murder to steal W.'s marijuana. The evidence showed that W. was a marijuana dealer, and he always kept his marijuana in a dark or peach-colored backpack. The day before the murder, W. was seen carrying three to four ounces of marijuana in his backpack along

25.

with Xanax pills.  When W.'s backpack was found in his room after his death the next day, the backpack was empty and only marijuana residue remained.  Meanwhile, C.G. had been trying to obtain expensive belts from A.C. since the early morning hours on the day of W.'s murder.  Around 2:00 p.m. that afternoon, right after the murder, C.G. offered for the first time to trade a large amount of marijuana for the belts.  C.G. sent A.C. a picture of a bag of marijuana, which he admitted sending during his testimony, and that photograph showed background elements of C.G.'s apartment patio.  Later that night, after W.'s death, C.G. went to A.C.'s house to obtain the belts, but A.C. balked and told C.G. to go home.

Then, a couple of days after the murder, B.L.'s friend Breeza purchased marijuana from C.G. that smelled and looked exactly like W.'s marijuana—which was distinctive both in color and odor.  Crediting B.L.'s testimony, there was sufficient evidence for the juvenile court to infer C.G. had W.'s marijuana after the murder; that he obtained it by taking the marijuana from W.'s backpack after killing him; and when C.G. was unable to use it to make a deal for the belts, he decided to sell it.  That C.G. and W. were best friends was something the juvenile court could consider in weighing the evidence, but it did not undercut an inference C.G. was motivated to kill W. to obtain the means to get the belts.  (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238 ["the incomprehensibility of the motive does not mean that the [factfinder] could not reasonably infer that the defendant entertained and acted on it"].)  Further, the juvenile court was entitled to discredit C.G.'s testimony that he and W. stole marijuana from W.'s supplier a few days before the murder, which W. and C.G. purportedly shared.

W. suffered five stab wounds—two in his neck and chest, and three fatal stab wounds to his abdomen.  An open pocketknife was found next to W. on his bed, which S. identified as W.'s, but Smith saw no blood on it and Smith did not recall the results of the forensic testing performed on the knife.  Ultimately, the murder weapon was never obtained by police.  Nevertheless, C.G. admitted owning a knife; he testified he went

26.

back to his apartment to get it after talking to Jackie about going to the park. He also testified he took that knife to his cousin's house that afternoon because he thought he was in danger, but inexplicably he left it there. That knife was never found among his things when his bedroom was searched by police. This evidence supported a reasonable inference C.G. dumped the knife at his cousin's house after the murder because he knew it tied him to W.'s stabbing.

Smith reported seeing a lot of blood in W.'s bedroom after W. was taken to the hospital around 3:40 p.m. He said it was not splattered on the walls, but it seemed to have pooled in places, and blood was found on many items, including in the bed, on the floor, and on various items in the room. There were also handprints on the wall. Yet, when Jackie saw C.G. in the apartment around 1:00 p.m., Jackie testified he did not remember seeing any blood on C.G., but acknowledged he was not looking too closely at his clothing. C.G. contends given the amount of blood at the scene, that Jackie did not observe any blood on C.G. indicated he did not stab W. However, testimony from S. and the first responding officer indicated that W. was moved from his bed to the floor so CPR could be administered—four different people were in the room providing CPR (S., O., and then two police officers) before an unknown number of EMS personnel responded to the bedroom, taking over the CPR efforts and transporting W. to the hospital. Together, these facts permitted a reasonable inference that the blood tracked around W.'s bedroom was most likely related to the life-saving attempts made by several people after the stabbing and not from the commission of the crime itself.

C.G. argues *People v. Morris* (1988) 46 Cal.3d 1 (*Morris*), disapproved on another ground by *In re Sassounian* (1995) 9 Cal.4th 535, 543, 545 and footnotes 5 and 6, illustrates how the inferences that purportedly support the juvenile court's determination, such as those outlined above, are nothing more than speculation. In *Morris*, the victim (Maxwell) was killed in a public bathhouse while wearing only socks and shoes. (*Morris, supra*, at p. 20.) Someone who looked like the defendant later presented a credit

27.

card that had Maxwell's friend's name on it, but the card was not collected and the defendant was not definitively identified. The defendant told a friend that he had been "making money off 'dates' with homosexuals" and that he had killed one, although he gave no reason for the killing except that "'he had to kill one.'" (*Id.* at p. 11.) For purposes of the robbery conviction and the robbery-murder special circumstance finding, the court concluded there was nothing in the evidence from which the jury could infer the defendant deprived the victim of personal property in his possession by force or fear—there was no evidence from which to draw an inference that the taking occurred either before or during the shooting, that the taking was from the person of the victim, or that the taking was accomplished by force or fear. (*Id.* at p. 20.)

The People correctly point out there is little utility in comparing other cases to evaluate the substantiality of evidence since each case turns on its own facts. (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) *Morris* presented a very different set of facts from this case, and the court upheld the murder conviction against the defendant in that case. Even viewing *Morris* as simply illustrative of the difference between drawing reasonable inferences from evidence and mere speculation, as C.G. urges in his reply brief, it changes nothing here.[5] The evidence from which reasonable inferences could have been drawn to support the juvenile court's determination are outlined above in detail—the reasonable inferences that could be drawn from that evidence were not speculative. And, a reasonable trier of fact could have concluded those inferences were the *only* reasonable ones to draw—i.e., they proved beyond a reasonable doubt that C.G. murdered W.

C.G. contends the police could have investigated more thoroughly in several regards, but that line of argument is irrelevant to a claim of insubstantial evidence. To the extent those claims and theories could have cast doubt upon the prosecution's case or

---

[5] In his reply brief, C.G. maintains his citation to *Morris* in his opening brief was for the limited purpose of defining a reasonable inference. C.G. does, however, draw extensive factual comparisons between *Morris* and this case, which we discuss *post*.

evidence, it was for the factfinder to assess and assign whatever weight or determination of credibility it wished. We do not substitute our evaluation of the evidence for that of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)[6]

The juvenile court's conclusion that C.G. murdered W. was supported by substantial evidence.

## C.     Substantial Evidence of Premeditation and Deliberation

C.G. also contends there was no substantial evidence of premeditation and deliberation, and the first degree murder finding is therefore unsupported and must be reversed.

### 1.     Applicable Legal Standard

An intentional killing "that is premeditated and deliberated is murder of the first degree." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand." (*Ibid.*) "'''[D]eliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]"

---

[6] The factual statement in C.G.'s opening brief presents argument about how the facts should be viewed and construed in favor of C.G., including matters of Jackie's and S.'s credibility and the purported shortcomings of law enforcement's investigation. Factual presentations that attempt to reargue on appeal those factual issues decided adversely at the trial level are contrary to "established precepts of appellate review" and are "doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399 [explaining why rearguing facts decided adversely to the appellant at the trial level is irrelevant to determining whether substantial evidence exists to support the factfinder's findings].) The opening brief also references facts as collected in probation reports, but many of those facts, including prior statements by Jackie, were never admitted as evidence or used for impeachment during the jurisdictional hearing. To determine the substantiality of evidence, an appellate court does not reweigh evidence or assess credibility on appeal, nor does it entertain "facts" not offered as evidence to the factfinder. (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.)

[Citation.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ….' [Citations.]" [Citation.]'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [(*Anderson*)], [the Supreme] [C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) *Anderson* explained that first degree murder convictions are typically upheld when there is evidence of all three categories of evidence, or at least extremely strong evidence of planning activity, or evidence of motive with either evidence of planning activity or evidence that the manner of killing indicated a preconceived design to kill. (*Anderson, supra,* at p. 27.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.'" (*People v. Koontz, supra,* 27 Cal.4th at p. 1081; accord, *People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

The California Supreme Court recently reiterated, "In the years since *Anderson*, '"we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight."' [Citation.] *Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first degree murder or alter the substantive law of murder in any way.'" (*People v. Morales* (2020) 10 Cal.5th 76, 89, quoting *People v. Rivera* (2019) 7 Cal.5th 306, 324 & *People v. Perez* (1992) 2 Cal.4th 1117, 1125; accord, *People v. Casares, supra*, 62 Cal.4th at p. 824; *People v. Halvorsen, supra*, 42 Cal.4th at p. 420.)

Yet, the verdict may not stand if based only on "'"'fanciful theories and unreasonable inferences [or] resort to imagination or suspicion." [Citation.]' [Citation.] 'Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'"" (*People v. Anderson, supra*, 70 Cal.2d at p. 24.)

### 2. Analysis

There was substantial evidence the killing was willful, deliberate and premediated. There was ample evidence of motive. The evidence showed C.G. was up half the night before the murder messaging with A.C. to get belts; they texted again at 9:00 a.m., and A.C. offered two belts for $700. Within about two hours of that conversation, C.G. skipped school to find his marijuana-dealing friend, W., who had product that could be traded (or sold) for the belts C.G. wanted. By about 1:00 p.m., W. was stabbed and C.G. was discovered in W.'s apartment. By 2:00 p.m., having misdirected Jackie to the park to help W., and sending messages to W.'s phone to manufacture an alibi and some other suspects for W.'s murder, C.G. started messaging with A.C. again for the belts. This time, however, C.G. wanted to trade marijuana for the belts and included a picture of marijuana in the messages. The two negotiated for nearly an hour and around 3:00 p.m. settled on a pound of marijuana in trade for the belts. After being informed of W.'s death that afternoon, and undergoing an interview with police around 7:00 p.m., C.G. again started pursuing the belts by going over to A.C.'s house that night. A.C. decided he only wanted money for the belts and reneged on the trade. A reasonable trier of fact could conclude C.G. desired the belts before he got to W.'s apartment that day, strongly suggesting he deliberated about killing W. to obtain the marijuana to acquire the belts at some point either before or during his time with W.

The manner of the killing, in concert with the strong evidence of motive, also supports a finding that the killing was a product of preexisting thought and reflection rather than unconsidered or rash impulse. The fact W. was stabbed five times and that the abdominal stab wounds were clustered together indicates the killing was *intentional*,

31.

but this manner of killing does not, *by itself*, demonstrate a preconceived design to kill. (See *People v. Alcala* (1984) 36 Cal.3d 604, 626 ["Absent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder."], abrogated by statute on another ground as recognized in *People v. Falsetta* (1999) 21 Cal.4th 903, 911; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118 [Observing that, ironically, "[t]he more genteel the form of dispatch, the more readily premeditation may be inferred. Vicious brutal knifings … tend to fall on the opposite side of the spectrum from, say, the administration of arsenic in a guest's tea."].)

However, there was more about the manner of killing than its brutality and the clear indication that death was the intended result. There was no evidence suggestive of a struggle. S. testified the room was not torn up when she found W. Jackie was in the apartment after S. left, but never heard anything like a fight or an argument. The medical examiner found only one small defensive wound on W.'s left thumb. Together, this evidence suggests the multiple stab wounds were not the product of a sudden, random explosion of violence or heated argument, but of an intentional killing according to a preconceived design to take the victim's life in a particular way. (*People v. Hawkins* (1995) 10 Cal.4th 920, 956 [sufficient evidence of premeditation and deliberation where there was "little if any evidence of struggle … that might lend support to the hypothesis that the murder occurred on impulse or in a rage"], abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

There was some evidence of planning, albeit not strong evidence. The timeframe of the killing, between negotiations over the belt, created an inference that C.G., at a minimum, went to W. to obtain resources for the trade. There was also a reasonable basis to infer that C.G. brought the murder weapon with him to W.'s apartment. The knife that killed W. was not discovered at the scene—W.'s own pocketknife was out on the bed next to him, but it did not have blood on it. C.G. admitted he had a knife and that he had taken it to his cousin's that afternoon and left it there. C.G. also had seen S. leave, and

32.

there was no evidence to show C.G. knew Jackie was still in the apartment after S. left. The fact the murder occurred almost right after S. left, in the privacy of a back bedroom of an apartment C.G. had reason to believe was empty, is indicative of some calculation and reflection rather than rash unconsidered actions.

Taken together, this evidence was sufficiently strong to permit a trier of fact to conclude beyond a reasonable doubt that C.G. committed the murder willfully and with deliberation and premeditation

### D. Robbery-murder Special Circumstance Finding

The juvenile court found true the special circumstance allegation that the murder was committed during the course of a robbery under section 190, subdivision (a)(17)(A). In his reply brief, C.G. focuses on other inferences the juvenile court could have drawn from the evidence to argue there was insufficient evidence to support the robbery-murder special circumstance finding.[7]

To establish the truth of the robbery-murder special circumstance, the prosecution had to prove "[t]he murder was committed while the defendant was engaged in … the commission of, … [¶] … [r]obbery in violation of Section 211 or 212.5." (§ 190.2, subd. (a)(17)(A).) Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Thus, there were two necessary prerequisites: substantial evidence of the robbery, and substantial evidence the murder was committed during the commission of the robbery. (*Morris, supra*, 46 Cal.3d at p. 19.) The robbery must not "merely be incidental" to the commission of the murder. (*People v. Marshall* (1997) 15 Cal.4th 1, 41.)

---

[7] To the extent C.G. claimed there was insufficient evidence to support the robbery-murder special circumstance allegation in his opening brief, it was limited to an assertion there was no substantial evidence linking him to any crime at all.

There was substantial evidence of both prerequisites here. There was evidence to infer W. was in possession of a significant amount of marijuana on the day of the murder and that C.G. took it at the time of the murder. Multiple witnesses, including C.G., testified W. was a marijuana dealer. Brian testified that a few days before the murder, he took W. to get product from his marijuana supplier in Hanford. The day before the murder, B.L. testified he saw about three to four ounces of marijuana in W.'s backpack while they were riding in a car together. Just before 1:00 p.m. on the day of the murder, S. saw W. outside wearing his peach-colored backpack in which W. was known to keep his marijuana—suggesting the backpack was not empty because W. had not left it in his room.

There was also strong evidence of C.G.'s driving motivation to steal W.'s marijuana. From midnight to about 3:00 a.m. on the morning of the murder, C.G. was messaging with A.C. about obtaining some expensive belts. The messaging continued at 9:00 a.m. when A.C. indicated he wanted $700 for the belts. About two hours later, C.G. skipped school and sought out W. at his apartment. Two witnesses saw C.G. and W. together right before the murder, including S. who saw them together when she left the house between 12:30 and 12:45 p.m.

The evidence indicated the murder occurred around 1:00 p.m., and C.G. was seen in the apartment around 1:00 p.m. by Jackie. By 2:00 p.m., C.G. was messaging A.C. again about the belts, this time offering marijuana as a trade. C.G. sent A.C. a photograph of marijuana in a bag, and they agreed on a pound of marijuana for the belts—a deal that ultimately fell through. Meanwhile, W. was found in his bedroom, and his backpack where he normally kept his marijuana was empty. B.L. testified his friend Breeza purchased marijuana from C.G. a few days after the murder that was the distinctive type of marijuana that W. sold. C.G. admitted he sold Breeza marijuana. Taken together, a reasonable trier of fact could conclude from this evidence C.G. intended to rob W. of his marijuana before or during the murder, took W.'s marijuana

34.

from his backpack, ultimately murdering W. during the commission of that robbery. (*People v. Carrington* (2009) 47 Cal.4th 145, 187 ["'[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.'"].)

C.G. asserts Jackie never saw him with anything in his hands when Jackie found C.G. inside the apartment around 1:00 p.m.; thus, C.G. maintains, that evidence militates a conclusion C.G. never took W.'s marijuana. However, that did not eliminate the possibility C.G. had marijuana somewhere on his person when Jackie saw him. The evidence C.G. tried to trade marijuana for the belts right after the murder in combination with W.'s empty backpack was circumstantial evidence from which it could be inferred C.G. had taken W.'s marijuana. When C.G. was discovered selling the same type of marijuana as W. always had a few days after the murder, that too was circumstantial evidence from which to reasonably infer C.G. took the marijuana from W.'s backpack at the time of the murder. Although no one actually witnessed C.G. take W.'s marijuana at the time of the murder, there was substantial evidence from which the factfinder could reasonably conclude C.G. did so.

C.G. argues there was evidence he and W. would steal drugs together from other people, including from W.'s supplier a few days before the murder; thus, there was no basis to infer the marijuana C.G. had after the murder was the marijuana from W.'s backpack. The juvenile court, however, was not required to accept C.G.'s testimony that he and W. stole marijuana from W.'s supplier—and it expressly did not do so. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463 ["'A trier of fact may accept such witnesses as he wishes and reject others .…'"].) Additionally, Brian testified he was the one who helped W. obtain his marijuana supply, and had driven W. to his supplier just a couple of days before the murder. Brian also testified C.G. purchased marijuana from W. on prior occasions, which C.G. would have had no reason to do if he too were involved in selling his own supply of marijuana, as C.G. claimed. The juvenile court was entitled to reject

35.

C.G.'s testimony and his counsel's argument that C.G. had the same type of marijuana as W. after the murder because they had shared the marijuana stolen from W.'s supplier. (*Id.* at pp. 1463–1464 ["'[T]he testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.'"].)

We disagree with C.G.'s assertion the evidence supporting the robbery-murder special circumstance finding is like that in *Morris*, where the court found lacking the robbery and robbery-murder special circumstance evidence. Materially distinguishable from this case, there was no evidence in *Morris* that robbery was a motive for the killing, and there was no evidence anything of value had been taken from the victim at the time of the murder, let alone by force or fear. (*Morris, supra*, 46 Cal.3d at p. 20.) A credit card linked to the victim was presented to a sales associate by someone who only looked like the defendant—the defendant was not actually identified as having the card. (*Id.* at pp. 11 & 20.) Moreover, the credit card had not been used for the two-month period between when the victim acquired it and when the victim was killed, so there was no evidence to infer when the victim had it last, unlike here where W. was seen with marijuana and pills the day before the murder. Without any evidence the defendant intended to rob the victim in *Morris*, there could have been any number of ways to speculate about how and why the defendant may have ended up with the card. (*Id.* at pp. 11 & 20.) Here, also unlike *Morris*, C.G. was connected to W.'s marijuana after the murder by B.L.'s testimony and his own admission he sold marijuana to Breeza; there was physical evidence tying C.G. to the crime scene; and there was circumstantial evidence of C.G.'s strong motive to steal W.'s marijuana to make a deal with A.C.

In sum, there was substantial evidence to support the juvenile court's finding the robbery-murder special circumstance allegation was true.

## E.    Voluntary Intoxication

In his reply brief, C.G. argues his testimony that he was under the influence of Xanax and marijuana undercuts the specific intent necessary to commit first degree murder or formulate the specific intent to steal prior to or during the murder for purposes of the robbery-murder special circumstance finding. Not only is this argument forfeited by C.G.'s failure to raise it in the opening brief, it is also without merit.[8]

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant formed a required specific intent, or, when charged with murder, whether the defendant premediated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) Aside from the first degree murder allegation here, robbery is also a specific intent crime to which the defense of voluntary intoxication may apply. (*People v. Page* (1980) 104 Cal.App.3d 569, 575.) A voluntary intoxication defense requires evidence of the defendant's voluntary intoxication *and* evidence the intoxication affected the defendant's actual formation of specific intent. (*People v. Williams* (1997) 16 Cal.4th 635, 677.)

The juvenile court was not obligated to accept C.G.'s testimony that he ingested Xanax and marijuana when he was with W. Moreover, other evidence supported a reasonable inference that even if C.G. had ingested those substances around the time of the murder and robbery, he did not lack the ability to formulate the specific intent necessary to commit those crimes. The evidence demonstrated C.G. was capable of coming up with an on-the-spot story about W. being in trouble at the park when C.G. was confronted by Jackie in the apartment; he was able to send messages to W.'s phone in an

---

[8]    The issue of C.G.'s purported intoxication was mentioned in the opening brief only in relationship to C.G.'s argument his counsel should have called an expert to explain the effects of Xanax. There was no argument related to a voluntary intoxication defense. "'[P]oints raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'" (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

attempt to create an alibi and/or other suspects; he continued to negotiate a purchase of the belts with A.C.; he managed to get a ride to his cousin's house; and he remembered to bring his knife and leave it there. A trier of fact could reasonably conclude any voluntary intoxication did not negate C.G.'s ability to formulate the specific intent necessary to steal W.'s property and murder W. with premeditation and deliberation. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134 [evidence of voluntary intoxication, even where legally relevant, may be factually unconvincing; the factfinder is entitled to reject a voluntary intoxication claim].)

## II.    *Brady* **Violation Claim**

C.G. claims there was evidence of a bloody footprint located in W.'s bedroom, which was cut out and removed from the scene by law enforcement personnel, that was never released to the defense in time to be used at trial. C.G. asserts this timely disclosure failure violated his constitutional rights pursuant to *Brady, supra*, 373 U.S. 83.

The Fourteenth Amendment's due process clause creates a duty upon the prosecution to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material as to guilt or punishment. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra*, 373 U.S. at p. 87.)

"The [United States Supreme C]ourt has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."' [Citation.] In order to comply with *Brady*, therefore, 'the individual

prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

As such, to establish a *Brady* violation, "the defendant must prove that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." (*United States v. Erickson* (10th Cir. 2009) 561 F.3d 1150, 1163 (*Erickson*).) The *Brady* disclosure requirement applies to juvenile delinquency proceedings as well as criminal proceedings. (*J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1335, citing *Joe Z. v. Superior Court* (1970) 3 Cal.3d 797, 806, fn. 5.) We review a *Brady* claim de novo but give great weight to the trial court's factual findings when supported by substantial evidence. (*Erickson, supra*, at p. 1163.)

To support his *Brady* claim, C.G. cites a letter submitted to the juvenile court after the contested jurisdictional hearing by someone named Isabel V., who apparently observed the trial. The letter comments that the prosecution "failed to notify and release the 'Bloody boot print' discovered in the bedroom of [W.] They failed to release this information to the defense on time for the defense to use."

Isabel's posthearing letter does not establish evidence was withheld by the prosecution. It is not even clear what Isabel's letter is based upon, such as a photograph, a document, or some other evidence admitted at trial. When asked if there were shoe or bootprints discovered in W.'s bedroom, Smith testified he did not remember any. The criminalist who collected evidence from the bedroom did not testify about any shoe or bootprints, and the record on appeal contains no photograph of such a bootprint. The letter's reference to a bootprint collected by police is entirely unsubstantiated.

Notably, defense counsel never objected to any evidence as undisclosed or having been disclosed untimely. C.G. points to no evidence (a document, a photograph, a police report, a lab report, etc.) that the prosecution actually failed to disclose or disclosed untimely. "A *Brady* claim fails if the existence of favorable evidence is merely

39.

suspected." (*Erickson, supra*, 561 F.3d at p. 1163; accord, *United States v. Warren* (7th Cir. 2006) 454 F.3d 752, 759 ["[The defendant] is simply unable to point to any specific evidence, exculpatory or otherwise, withheld by the government. Without that, his *Brady* claim fails to get off the ground."].) C.G.'s citation to Isabel's letter, which, in turn, references a bootprint, is insufficient to support a *Brady* claim.

Beyond this, there were four people in W.'s bedroom before EMS ever arrived—S., W.'s brother O., and two responding officers—who all assisted with CPR. Then, an unknown number of EMS personnel took over CPR at the scene and transported W. to the hospital. The crime scene was necessarily disturbed before it was documented by Smith or crime scene investigators, so the existence of a bootprint—even assuming there was such a print—can hardly be tied solely to an assailant. Reference to a bootprint by someone who observed the jurisdictional hearing is insufficient to establish the existence of such evidence or its materiality. There is no evidence of a *Brady* violation.

## III.    Ineffective Assistance of Counsel Claims

C.G. contends that his counsel was ineffective in failing to properly investigate the case and in failing to retain and call an expert witness to testify about various issues. The due process right to effective assistance of counsel extends to minors in juvenile proceedings. (See, e.g., *Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 857.)

To establish ineffective assistance of counsel, the appellant must first demonstrate that counsel's performance was deficient—that it "fell below an objective standard of reasonableness" under "prevailing professional norms," and that it caused prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*); accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

Appellate courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case" (*Strickland, supra,* 466 U.S. at p. 690), applying a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time [of that conduct.]'" (*Wiggins v. Smith* (2003) 539 U.S. 510, 523.)

40.

"[A] reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

As explained in *Mai*, "[i]t is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai, supra*, 57 Cal.4th at p. 1009.)

## A. Failure to Investigate Claims

C.G. asserts a variety of failures to investigate by his counsel: (1) the failure to obtain the clothing C.G. was wearing at the time of the stabbing and have it tested for blood or DNA; (2) the failure to investigate Alex and the marijuana that W. and C.G. purportedly stole from him a few days before the murder; (3) the failure to investigate Jackie, including Jackie's criminal background; (4) the failure to investigate or call the men C.G. identified who were purportedly chasing him and W. in the white Expedition on the morning of the murder; (5) the failure to investigate the threats made against C.G.; (6) the failure to investigate the belt on which C.G. testified he cut his hand while carving a new notch in it; (7) the failure to investigate the photograph of marijuana offered at trial; and (8) the failure to investigate whether C.G. jumped into a neighbor's patio to hide after being chased by the men in the white Expedition.

The People dispute there was any showing of deficient performance by defense counsel, but even assuming there was, C.G. has not established any presumed failure was prejudicial.

## 1. No Failure to Investigate Established

Other than his unsupported assertions, C.G. offers no evidence his counsel actually failed to investigate any of the matters C.G. articulates. There is no declaration or

41.

testimony from counsel about what was or was not investigated. Moreover, there is no basis to infer the lack of evidence presented on these issues indicates the underlying investigative efforts were inadequate. (See *People v. Williams* (1988) 44 Cal.3d 883, 933 [basing assertion of counsel's failure to investigate on the record's lack of investigative activity "establishes neither an actual failure to investigate nor a basis for concluding that evidence supportive … was not offered as a result of counsel's failure to discover it"].) On this record, we have no basis to conclude the matters identified by C.G. were inadequately investigated by his counsel.

**2.      The Record Does Not Negate the Possibility of a Legitimate Tactical Purpose and No Prejudice is Established**

Even assuming trial counsel did not investigate any of the matters C.G. articulates, the record does not negate the possibility of legitimate tactical reasons why counsel might have elected not to do so. (See *People v. Arredondo* (2019) 8 Cal.5th 694, 711 [reversal for ineffective assistance of counsel warranted on direct appeal only if there was no rational tactical purpose for the challenged act or omission, counsel was asked and failed to provide a reason, or there could be no satisfactory explanation].) We consider the various investigative issues C.G. identifies.

***Forensic Evidence and Blood Spatter***

C.G. asserts his counsel failed to obtain and perform any testing on the clothing and shoes C.G. was wearing on the day of the murder. C.G.'s contention is premised on the notion that testing would have revealed no blood on these clothing items and, thus, would have been evidence C.G. was not the assailant.

As the People point out, C.G. was not arrested until a year after the murder, so even if his counsel could have tested the clothing C.G. identified he had been wearing on the day of the murder, the probative value of any testing would have been miniscule, at best. Assuming no blood was found on the clothing, this would hardly be persuasively exculpatory given the passage of time. Moreover, the clothing was not collected by

42.

police investigators. Whatever clothing could have been produced for testing would have been selected by C.G. based only on his assertion those were the clothes he was wearing.

The decision to forego testing C.G.'s clothing under these circumstances could have been a reasonable decision about resource allocation given the unlikelihood of discovering probative evidence. (See *In re Thomas* (2006) 37 Cal.4th 1249, 1264, fn. 4 [pointing out decision to curtail investigation in an area based on improbability of finding evidence is not necessarily ineffective assistance; "Courts must be careful not to second-guess resource allocation; it is for counsel to decide what leads are or are not worth exploring."].) For the same reason, C.G. has not established he suffered any prejudice as a result of not testing his clothing for evidence.

### *Purported Burglary of Alex's Apartment*

C.G. testified W. had been upset with his supplier, Alex, and W. wanted C.G. to help him steal marijuana from Alex. According to C.G., a few days before the murder he and W. went to Hanford, broke into Alex's apartment and stole marijuana. Afterwards, C.G. testified, Alex threatened C.G. and W. The juvenile court rejected C.G.'s testimony that he and W. stole marijuana from Alex days before the murder. On appeal, C.G. asserts that had his counsel investigated Alex and the burglary, there would have been evidence that corroborated C.G.'s testimony about how he had the same marijuana as W. after the murder.

Assuming Alex could have been located and would have been willing to testify about possessing marijuana that was purportedly stolen from his apartment around May 10, 2017, his testimony would not have established that W. and C.G. shared what they took, or that C.G. had not taken the marijuana from W.'s backpack, which was found empty after the murder. Defense counsel could have reasonably elected not to expend resources on this avenue of investigation given the extremely limited probative value of any evidence potentially discovered. (*Rompilla v. Beard* (2005) 545 U.S. 374, 383 [duty to investigate "does not force defense lawyers to scour the globe on the off

43.

chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste"].) Moreover, C.G. has not established any prejudice since this evidence does not create a reasonable probability of a more favorable outcome. (*Strickland, supra*, 466 U.S. at pp. 692–693; *People v. Ledesma, supra*, 43 Cal.3d at pp. 217–218.)

### Jackie as a Potential Third Party Culprit

C.G. maintains his defense counsel never investigated Jackie as a possible third party culprit even though he was in the apartment around the time of the murder. C.G. argues inconsistencies in Jackie's testimony indicated he was not being forthright. Specifically, C.G. notes Jackie testified he did not wear glasses, but then Jackie testified that, right before he went to the park, he "went back to the room, got [his] shades and [his] glasses, [his] glasses, [his] hat, and took off down to the park."

As the People contend, defense counsel may have reasonably concluded he would lose credibility with the court if he asserted in closing argument that Jackie's testimony about wearing glasses was inconsistent and suggested Jackie was culpable for the crime, especially in the absence of any evidence actually linking Jackie to the crime. Jackie's testimony about going back to his room for "glasses" may have been an effort to articulate what he meant by "shades." This purported inconsistency had no meaningful bearing on Jackie's credibility or whether he had anything to do with the murder.

C.G. also asserts that Jackie showered close to the murder from which it could be inferred he was showering off blood, Jackie did not work so he had motive to commit the murder (ostensibly for money from the marijuana), and documents outside the record indicate someone with Jackie's name has a prior 1996 conviction under section 273a, subdivision (b), for causing willful harm or injury to a child. C.G. contends these were all things that should have been investigated prior to the jurisdictional hearing and could have been used to raise reasonable doubt about C.G.'s guilt.

44.

The ability to investigate Jackie's room and shower for blood more than a year after the murder, when C.G. was arrested, is highly questionable at best. And, even if it were somehow possible to perform such testing, defense counsel could have reasonably determined the likelihood of obtaining reliable and admissible evidence given the passage of time was so small as to not warrant the resources. The mere fact that Jackie may have had an opportunity or a motive to commit the crime would not likely have been admissible as evidence of third party culpability in the absence of other evidence linking him to the crime. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242 [evidence of mere motive or opportunity to commit the crime in another person, without more, is insufficient to raise reasonable doubt about a defendant's guilt—there must be evidence linking the third person to the actual perpetration of the crime].) As such, counsel could have concluded any investigation about Jackie, in the absence of any indication he was involved in the murder, was not likely to bear admissible or probative evidence.

### *Persons from the White Expedition*

C.G. testified he recognized the men from the white Expedition who chased him and W. shortly before W. was killed. He claimed not to remember whether he explicitly told Smith during an interview these were *not* the men who chased him. On appeal, C.G. complains that defense counsel did not investigate these men or call either of them as witnesses to testify about whether there were any issues between them and W.

There is no evidence these witnesses were identified to counsel, that counsel unreasonably failed to investigate, or that these men would have been willing to testify beneficially to C.G. In fact, C.G.'s cross-examination suggested he had denied to Smith these men were involved in the chase. Defense counsel may have reasonably concluded further investigation into these men would be fruitless. Defense counsel's decision not to call these men as witnesses could have been a matter of legitimate trial tactics, up to and including that these witnesses might not have offered testimony favorable to C.G. (*People v. Carrasco* (2014) 59 Cal.4th 924, 989.)

### *C.G.'s Mother's Report of Threats Against C.G.*

C.G. testified during cross-examination that he did not tell his mother's former boyfriend that he had been threatened and chased or ask him to call the police. C.G. also testified he took a knife with him to his cousin's house because he thought he was in danger. C.G. testified on redirect examination that he had never reported to the police any of the times he had been jumped by people with guns and knives or got into fights. On appeal, C.G. asserts, his mother had made past reports about threats against C.G., defense counsel was informed of these reported threats, but he never investigated them.

There is no evidence defense counsel had information about reported threats against C.G. that counsel failed to investigate—this is merely C.G.'s unsupported assertion. In any event, it is unclear how this would have helped the defense case. The central question the prosecutor posed about reporting to the police related to C.G. being chased by men in the white Expedition on the day of the murder and whether C.G. authentically believed he was in danger at that time. The core credibility challenge to C.G. with respect to that incident, however, was not centered on his failure to report it, but on Smith's inability to corroborate any of it upon investigation and the implausibility of the timing. Whether C.G.'s mother reported different threats against C.G. on different occasions did not materially bear on the credibility of C.G.'s story he was chased on this particular occasion. On this record, there is no basis to conclude defense counsel's failure to offer any evidence of reported threats against C.G. establishes a failure to investigate. Moreover, given the attenuated value of such evidence, there is no reasonable probability this evidence would have produced a more favorable outcome for C.G. at the hearing, thus no prejudice has been shown.

### *Failure to Investigate the Belt*

C.G. testified that a couple of days before the murder, he used a knife from W.'s kitchen to carve an extra hole in his belt so it would fit properly. C.G. argues his counsel

never investigated or obtained this belt, despite that it would have substantiated C.G.'s testimony about why his blood was found in W.'s room.

The belt, like the clothing C.G. was purportedly wearing on the day of the murder, would have been produced by C.G., as it was not something the police collected during their search of C.G.'s bedroom. Even assuming defense counsel did not investigate or take measures to obtain the belt, counsel may have reasonably determined that presenting a belt that had a hole hand-carved in it would not establish when or where that hole was created, and it would do absolutely nothing to substantiate or corroborate C.G.'s story. On this record, there is no evidence of deficient performance nor, assuming a deficient performance, any resulting prejudice.

### *Digital Photo of the Marijuana*

C.G. asserts his counsel did not object to the photograph of the marijuana sent from C.G. to A.C., nor was there any investigation by defense counsel about the time and date the photograph was taken (as opposed to when it was sent). C.G. claims "[i]t is understood these photos were stock photos from an internet search." C.G. contends an investigation of the photographs could have revealed they were taken on a different time and date.

Smith testified he extracted the data from C.G.'s cell phones. Based on that extraction data, Smith testified that at 2:19 p.m. on the day of the murder, C.G.'s phone sent a picture to A.C.'s phone of a bag of marijuana. That photograph was admitted as People's exhibit No. 13. Smith testified that photograph had background elements that were very similar to the backyard patio area of C.G.'s residence. C.G. admitted he sent A.C. the photograph of marijuana identified as People's exhibit No. 13. A.C. testified C.G. sent him a photograph of marijuana, but testified the picture of the marijuana in People's exhibit No. 13 was not the one he received from C.G.

C.G. cites no evidence the photograph admitted as People's exhibit No. 13 was not properly authenticated. Defense counsel objected to admission of the photograph in

People's exhibit No. 13 on the ground of hearsay, but there was no foundational challenge.

As far as defense counsel's purported failure to investigate the phone extraction data obtained by police, there is no evidence what defense counsel did or did not do. C.G. fails to point to evidence showing the marijuana photograph was "stock," ostensibly meaning a photograph C.G. did not create himself. Moreover, it is entirely unclear what further investigation of the photograph would have revealed, or what reason there was to believe the data obtained from the phone extraction did not accurately show the creation date of the photo. Counsel may have reasonably concluded there was no legitimate reason to investigate the phone data extraction process, the time or date stamp on that photograph, or a foundational basis to object to the photograph when offered at the hearing.

### C.G.'s Back Patio

C.G. argues he had taken Xanax and smoked marijuana before the time of the murder, so defense counsel should have investigated whether C.G. jumped into the wrong back patio when he was being chased by the men in the white Expedition.

The record reveals nothing about what counsel did or did not do with respect to investigating this or any other issue. There could be any number of legitimate reasons why defense counsel offered no evidence on this issue, including that canvassing all of the neighbors more than a year after the murder bore no fruitful evidence that C.G. jumped onto their patio on May 10, 2017. Even assuming there was such evidence that counsel unreasonably failed to obtain, its probative value was extremely limited given the other extensive problems with C.G.'s story of being chased by men in a white Expedition, including that the timing of that chase was extremely implausible, it could not be corroborated upon police investigation, and it was in conflict with W.'s ankle monitor data. No deficient performance by counsel is established, nor has prejudice been demonstrated.

48.

**B.      Failure to Call An Expert Witness**

C.G. argues his counsel rendered ineffective assistance by failing to obtain an expert witness to offer testimony about several matters related to the blood evidence at the scene and the effects of the Xanax C.G. claimed he ingested around the time of the murder.

There is no evidence defense counsel actually failed to seek an expert witness on these issues—there is no testimony or other evidence that shows what counsel did or did not do in preparing the case.  Counsel may very well have consulted with an expert— C.G. is merely speculating that counsel did not because no expert was called to testify. (See *People v. Williams, supra*, 44 Cal.3d at p. 933 [basing assertion of counsel's failure to investigate on the record's lack of investigative activity "establishes neither an actual failure to investigate nor a basis for concluding that evidence supportive … was not offered as a result of counsel's failure to discover it"].)

Without evidence that counsel unreasonably failed to seek out an expert, the decision not to call an expert is generally a matter of trial tactics.  (*People v. Bolin* (1998) 18 Cal.4th 297, 334 ["Whether to call certain witnesses is [generally] a matter of trial tactics, unless the decision results from unreasonable failure to investigate."].)  One possible and reasonable explanation for counsel's failure to call an expert to testify could have been counsel's inability to find an expert who could provide favorable testimony regarding the blood evidence or the Xanax.

As to the Xanax and its effects, there was no evidence outside C.G.'s own testimony about the amount of Xanax he actually ingested for an expert to offer opinions about.  Moreover, counsel may have considered focusing on the Xanax use through

expert testimony to be counterproductive to the defense case, particularly considering concessions that might have been obtained from any expert on cross-examination.[9]

Finally, even assuming for the sake of argument that counsel's conduct fell below professional standards in not retaining and calling an expert witness on these topics, C.G. does not show what testimony an expert would have offered. To affirmatively demonstrate that counsel rendered ineffective assistance by failing to call an expert witness, defendant must identify "'exculpatory or impeachment evidence that counsel could have revealed by … [examination of defense experts] … that would have produced a more favorable result at trial. [¶] … Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused.'" (*People v. Bolin, supra*, 18 Cal.4th at p. 334.) Under these circumstances, C.G. has not established defense counsel was ineffective or that any assumed deficient performance in failing to retain and call an expert was prejudicial.

## DISPOSITION

The juvenile court's findings and dispositional order are affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


DeSANTOS, J.

---

[9]     Xanax-use testimony by an expert could have risked cementing or further underpinning the prosecution's theory of motive—that C.G. senselessly killed his best friend for marijuana to buy a belt.